IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARK D. SANDERS,

               Petitioner,

      vs.

DARREL G. ADAMS, Warden, Corcoran
State Prison,

              Respondent.

No. 2:09-cv-03398-JKS

MEMORANDUM DECISION

Mark D. Sanders, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus under 28 U.S.C. § 2254. Sanders is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Corcoran State Prison. Respondent has answered, and Sanders has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

In June 2008 Sanders was convicted after a jury trial in the Solano County Superior Court of Murder in the First Degree (Cal. Penal Code § 187(a)), Attempted Robbery (Cal. Penal Code §§ 211, 664), Burglary in the First Degree (Cal. Penal Code § 459), and Conspiracy to Commit Robbery and Burglary (Cal. Penal Code § 182(a)(1)). The jury also found true the personal handgun use enhancement allegations (Cal. Penal Code § 12022.53(b), (c), and (d)). The trial court sentenced Sanders to an indeterminate prison term of 25 years to life on the first degree murder conviction, plus a consecutive, indeterminate term of 25 years to life for the personal use of a handgun enhancement. Sentences on the remaining counts were stayed. (Cal. Penal Code

§ 654). Sanders timely appealed his conviction and sentence. The California Court of Appeal,

First District, affirmed in an unpublished decision,[1] and the California Supreme Court denied

review on October 28, 2009. Sanders timely filed his petition for relief in this Court on

December 3, 2009. Sanders has also requested an evidentiary hearing.

The facts underlying Sanders's conviction were summarized by the California Court of

Appeal.

> All charges stem from a plan to rob Curtis Allen at his Vallejo home, and his resulting shooting death, after he failed to pay prostitute Amanda Taylor for her services. Taylor and prostitute Carla Lopez worked over the internet for their pimp, Kim (Tim-Tim) Saelio, and testified at trial under plea agreements allowing them to avoid murder charges by pleading guilty to voluntary manslaughter. Saelio did not testify. He was shot dead by Oakland police in late June 2006, during the last of several attempts by various law enforcement agencies to take him into custody.
>
> Sanders did not testify, leaving Lopez and Taylor the sole percipient witnesses at trial. Their accounts were largely consistent. Taylor had worked for Saelio longer than Lopez. Saelio had grown increasingly violent toward Taylor and had beaten her 40 to 50 times, sometimes for no apparent reason. He carried a black semi-automatic style gun, like the one ultimately used to kill Allen, and once held it to Taylor's face, threatening to pistol whip her. He had beaten Lopez, too, 10 to 12 times. Lopez and Taylor knew Sanders by the name Bizz, and Taylor referred to Lopez by her apparent business name, Sparkle.
>
> In an encounter set up by Saelio, Taylor arranged by phone with Allen to have two nights of her services for $3,000. On the first night, November 8, 2005, she drove alone to Vallejo in a white SUV Saelio had rented for her. She met Allen at a video store and followed him to his home at 840 Foothill Drive, where they had drinks and sex, fell asleep by early morning, and spent the night together. Payment was a problem. Allen had paid her nothing but impressed her with a display of expensive looking jewelry he had in a box and told her he had a house in Las Vegas. Taylor thought he had a lot of money and might be a pimp, even someone with whom she could 'retire' from prostitution.
>
> Taylor was a smoker, and since the nonsmoker Allen had a rule that she had to smoke outside, she would step out into the backyard to smoke. "Before anything ever happened" that night, Taylor spoke by cell phone with Saelio about not getting paid but having seen the jewelry and that the house looked nice.

---

[1] *People v. Sanders*, 2009 WL 2427737 (Cal. App. Aug. 10, 2009).

Saelio told her it was okay to stay the night.  Taylor left Allen's house around 8 a.m., having told him that she was interested in going to Las Vegas with him (her home town) and would get her clothes and come back.

Staying in phone contact with Saelio on the way, Taylor drove to a Days Inn in San Jose where she and Lopez were staying.  They packed up their things, drove back to Oakland, and met with Saelio outside the home of a friend of his called D-Nut.  In a long conversation in the car, they planned that Taylor would go back and have sex with Allen a second night and, after Allen fell asleep, get the jewelry and come outside where they would be waiting for her in a car.  Sanders was not present for this planning.

Lopez drove and dropped Taylor off at Allen's house in Vallejo that evening, using the white SUV.  Taylor phoned Allen to say she would be staying the night.  The women arrived very late due to a stop first in Sacramento to pick up a friend of Lopez's named Tina.  Initially unable to contact Allen by phone, they waited for him at a gas station.  Upon dropping Taylor off, Lopez met and saw Allen briefly when she used his bathroom.  She then drove back to Oakland, needing Saelio to get her a room for the night.  Saelio told her to meet him at a Motel 6 on Embarcadero.

At the Motel 6, Lopez saw Saelio in another car with Sanders.  Sanders tried there and at another Oakland motel to get them all a room, but there were no vacancies.  Then, after they drove to the nearby home of Saelio's mother, Lopez got a text message from Taylor saying, "He moved it."  She told Saelio, who already knew and "was mad."  He and Sanders parked their car and got into hers, ordering her into the back seat.  Saelio drove them all to Vallejo.  They left Oakland at 2:00 a.m., and Taylor continued to phone them during the drive.  Saelio told Sanders once, in a joking way, that he was "supposed to shoot the guy if he tries to have Amanda," meaning stop her from running out of the house.  Lopez understood that Sanders was there "in case there was some kind of confrontation in the front yard."  Saelio was about five foot four and 140 pounds; Sanders was a lot bigger.  They arrived at Allen's house and sat parked around the corner, still getting calls from Taylor.

Inside the house, Taylor and Allen had drinks and sex again, but then Allen did not go to sleep as anticipated.  Taylor did not know where the box of jewelry was.  She stayed up and periodically went out to the back yard to smoke and use her phone to report to Saelio and Lopez that Allen was still not asleep.  This went on until dawn while the trio in the car talked about the plan and dozed from time to time.  Sanders at one point asked Saelio, "You're gonna let me go in the house with you, right?"  Both men repeated—Saelio to Taylor on the phone, and Sanders just in the car—"I didn't come out here for nothing."  Lopez awoke at one point to see Sanders holding Saelio's gun and wiping it.

In the house, Allen had gotten up and made himself some eggs to eat, and Taylor phoned Saelio to say that Allen was not going to sleep.  Saelio told her to unlock the front door and be quiet doing it so Allen did not hear.  She did.

3

Outside, Sealio pulled the car up in front of the house as Lopez heard him telling Taylor to unlock the door.  She saw Taylor come out the front door, sit on the porch, look in her purse, and go back inside.  Saelio then ordered Lopez to get in the front seat, not ask questions, and give him a black T-shirt so he could cover his face.  Sanders pulled the gun from his pants, got out of the car, and said no when Saelio asked him if he needed something.  Saelio put the shirt over his face and got out, following Sanders to the house and through the front door as Lopez got her shoes on and got behind the wheel.

Inside, Taylor was at the stove trying to light a cigarette from an electric burner as she heard Sanders enter.  She saw him holding a gun out in front of him, but turned back around to finish lighting her cigarette.  She heard Sanders say "Freeze" or "Get down," and heard a gunshot.  She looked back, and saw Sanders on the floor and Saelio running over to help him up.  They all ran out the front door (without any jewelry), Saelio first, then Taylor and Sanders.  Taylor had on clothes from Allen and left behind a black bag with her own clothes and shoes in it, plus her cell phone.  They all got into the car, and Lopez drove them away.  Taylor never saw what happened to Allen.

As Lopez drove, she asked what happened, and Saelio said Sanders shot Allen.  Sanders said he thought he saw Allen with a gun and so "shot him before he got shot."  People were "freaking out," and Sanders handed the gun back to Saelio, who removed something small and shiny—a shell, Taylor thought—and put the gun under the front seat, later throwing the shell out the window.  He said something like: 'I didn't tell you to kill him, I told you to rob him.'

They drove back to D-Nut's house in Oakland, where Saelio displayed his own ignorance of Allen's condition by saying they were "all lucky" because, if the gun had not "got stuck," the guy probably would have died.  From there, three of them went to the Embarcadero Motel 6 in the white SUV (or Jeep), and Sanders drove there in his own (blue or black) car.  Sanders procured a room (a surveillance video from the lobby showed him there), and Taylor and Lopez stayed there a day or two.  While at the motel, the four had concocted and rehearsed a story to tell police should they be arrested, and Sanders twice warned her, "If you can't hold water, say something now," which she took to be threats.[2]

## II.  GROUNDS RAISED/DEFENSES

In his Petition, Sanders raises the same three grounds he raised on direct appeal:  (1) the trial court erred in admitting evidence of other crimes and bad acts; (2) his trial counsel was ineffective by failing to object to the admission of the evidence of prior crimes and bad acts on

---

[2] *Sanders*, 2009 WL 2427737 at *1-*3.

the proper grounds; and (3) the trial court erred in denying Sanders's motion for a new trial on

the basis of jury misconduct.  Respondent asserts that Sanders's first ground is procedurally

barred on adequate and independent state law grounds.  Respondent does not raise any other

affirmative defense.[3]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[4]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[5]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[6]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[7]  When a claim falls under the

---

[3] *See* Rules—Section 2254 Cases, Rule 5(b).

[4] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[5] *Williams*, 529 U.S. at 412.

[6] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[7] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van*
(continued...)

5

"unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[8]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[9]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[10]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[11]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[12]

---

[7](...continued)
*Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[8] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[9] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[10] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[11] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[12] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

In applying this standard, this Court reviews the last reasoned decision by the state court.[13]  State appellate court decisions that affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[14]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[15]  This presumption applies to state trial courts and appellate courts alike.[16]

## IV.  DISCUSSION

### A.    Evidentiary Hearing

Sanders has requested an evidentiary hearing.  The Supreme Court recently made clear in *Pinholster* that "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."[17]  Although under *Pinholster* an evidentiary hearing in a federal habeas proceeding is not absolutely precluded, *Pinholster* also made clear that the discretion to grant a request for an evidentiary hearing is cabined by § 2254(e)(2),[18] which provides:

---

[13] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

[14] *Ylst*, 501 U.S. at 802-03.

[15] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[16] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[17] *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398-99 (2011); *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

[18] *Pinholster*, 563 U.S. at ___, 131 S. Ct. at 1400-01.

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>> (A) the claim relies on—
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Sanders's request in this case does not meet that standard, and his request for an evidentiary hearing must be denied.

**B.      Merits**

Ground 1:  Admission of Pimping Testimony

At trial, over the objection of trial counsel, the trial court allowed testimony that alluded to the fact that Sanders was "a pimp" that such testimony was based upon hearsay, and that the witness lacked personal knowledge of this fact.  Sanders did not challenge this ruling either on direct appeal or in his Petition before this Court.  Instead, Sanders argues that the evidence was other-crimes evidence, inadmissible for the purpose of showing propensity or character.  Sanders also argues that the trial court erred in not instructing on character or the limited use of other crimes evidence.  In rejecting Sanders's arguments the California Court of Appeal held:

> The parties agree, as we do, that Sanders forfeited these arguments by not raising them below (*id.,* § 353, subd. (a); *People v. Champion* (1995) 9 Cal.4th 879, 918) and that the court had no duty, without a request, to give a limiting instruction on other-crimes evidence (*People v. Collie* (1981) 30 Cal.3d 43, 63-64; Evid.Code, § 355 [limiting instruction is given "upon request"] ) or a

character instruction (*People v. Bell* (1875) 49 Cal. 485, 489-499 [instruction, if supported, should be given upon request]).[19]

Respondent contends that review of this claim is procedurally barred.  This Court agrees. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."[20]  This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims . . . ."[21]  [I]n order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well established at the time of the petitioner's purported default."[22]  The California contemporaneous objection rule is "clear, consistently applied, and well-established" where, as here, a party fails to make a proper objection to the admission of evidence.[23]  The rule is therefore operative in the case at bar as an "adequate and independent" state procedural bar.[24]  Moreover, the California rule is entirely consistent with federal law as established by the United States Supreme Court, which also requires an objection state the specific ground on which it is based.[25]

---

[19] *Sanders*, 2009 WL 2427737 at *6.

[20] *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

[21] *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992).

[22] *Morales v. Calderon,* 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted).

[23] *Melendez v. Pliler,* 288 F.3d 1120, 1124–25 (9th Cir. 2002).

[24] *See Collier v. Bayer,* 408 F.3d 1279, 1283 (9th Cir. 2005).

[25] Fed. R. Evid. 103(a)(1); *see generally Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right

(continued...)

Although the ultimate burden of proving adequacy of a state procedural bar is on the government, once it has "adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner."[26]  Sanders may satisfy his burden "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."[27]

The Court agrees with Respondent that, because Sanders's claim was defaulted in state court on an adequate and independent state ground, it will not be considered in federal habeas proceedings unless Sanders can demonstrate cause for the default and actual prejudice.[28]  To prove a fundamental miscarriage of justice, Sanders must show that a constitutional violation probably resulted in his conviction despite his actual innocence.[29]  Although at the gateway stage the petitioner need not establish his innocence as an "absolute certainty," Sanders must

---

[25](...continued)
before a tribunal having jurisdiction to determine it."); *Peretz v. United States*, 501 U.S. 923, 936–37 (1991) *and cases cited therein*.

[26] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

[27] *Id.*

[28] *See Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

[29] *See Schlup v. Delo,* 513 U.S. 298, 321-25 (1995) (linking miscarriages of justice to actual innocence); *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent."); *Murray v. Carrier,* 477 U.S. 478, 496 (1986) ("in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.")

demonstrate that more likely than not, no reasonable juror could find him guilty beyond a reasonable doubt.[30]

In his Traverse, Sanders does not address the procedural bar defense raised by the Respondent.  Consequently, Sanders has failed to either rebut the applicability of the procedural bar defense or to establish that he is actually innocent.[31]  Sanders's first ground is procedurally barred.

Ground 2:  Ineffective Assistance of Counsel

As an alternative to his first ground, Sanders argues that, by failing to raise the proper objection to the testimony that he was "a pimp," i.e., that it was other-crimes evidence, inadmissible for the purpose of showing propensity or character, his trial counsel rendered ineffective assistance of counsel.  In rejecting Sanders's arguments, the California Court of Appeal held:

> ***A.  Admission of Pimping Testimony***
>
> **Trial arguments.**  Defense counsel William Pendergast moved orally, in limine, to exclude "Vallejo police . . . suspicions that Mr. Sanders is a pimp or is involved in other criminal activity."  Discussion then clarified that his pimp status would come from Lopez and Taylor, and his own postarrest phone conversation from jail, and the court noted that the evidence would be relevant to explain the women's reactions to him, especially given anticipated defense expert testimony on relationships between prostitutes and pimps.  Pendergast submitted with the comment:  "Mr. Kauffman may be right that phone call is as explicit as he believes it is, and if that's the case, that's fine, I wouldn't have an objection. But their belief that he's a pimp is not relevant.  It's based all on hearsay.  They have no personal knowledge."  The court denied exclusion with these remarks: "Well, I think it is relevant, and it's relevant because you're raising the issue.  You are the

---

[30] *House v. Bell*, 547 U.S. 518, 538 (2006).

[31] This Court also notes that, "[t]o the extent the Supreme Court has addressed the issue, it has expressly reserved consideration of whether the admission of prior bad acts under state law to show propensity constitutes a due process violation."  *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006) (citing *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991)).

one who [is] raising the issue of the relationship between the prostitutes and the pimp, Tim-Tim, and if they believe, whether they know it or not, whether they've ever turned a trick for Mr. Sanders, ever got any money from Mr. Sanders, ever was sent to some John's motel room by Mr. Sanders, to me, that's really not relevant. If they believe that he's a pimp, that's why he's hanging with Tim-Tim, 'that's the information we have, that's why I was afraid of him,' then I think it's relevant, and I think you're raising the issue why it's relevant."

When Taylor later related, at the close of her testimony, that she was not supposed to talk to Sanders while with Saelio because Sanders was known to her as another pimp, Pendergast objected based on hearsay, and lack of foundation or personal knowledge. The objections were overruled.

After Taylor stepped down and the jury left, Pendergast objected that Taylor lacked a factual basis and only *thought* Sanders was a pimp. He added: "We talked about it in in limines that perhaps it was relevant, that her belief alone was perhaps relevant. But if that is the theory under which it was admitted, I would ask the Court to give an appropriate limiting instruction. If that's not the theory under which it is admitted, then I believe it's without foundation and lacks personal knowledge, and it's based on hearsay." The court ruled: "I'm going to deny your request in the first place, and she testified as to her history as a prostitute, and she took a trip with your client, and one of his prostitutes to Los Angeles a few months before this incident. I think that's her opinion. If the jury believes her, the jury believes her. So your request is denied, and your objection is overruled."

**Appeal arguments.** Sanders does not challenge any of the rulings as made on his objections and request below, thus implicitly accepting that the evidence of him being a pimp was not inadmissible hearsay, or without foundation or personal knowledge. What he argues is that his pimp status was other-crimes evidence inadmissible for propensity or character (Evid.Code, §§ 1101-1102), whose probative value on any permitted basis was substantially outweighed by risk of undue prejudice (*id.,* § 352). He also complains that no instructions on character or the limited use of other-crimes evidence (CALCRIM Nos. 350 & 375) were given. He claims a resulting denial of federal due process.

The parties agree, as we do, that Sanders forfeited these arguments by not raising them below (*id.,* § 353, subd. (a); *People v. Champion* (1995) 9 Cal.4th 879, 918) and that the court had no duty, without a request, to give a limiting instruction on other-crimes evidence (*People v. Collie* (1981) 30 Cal.3d 43, 63-64; Evid.Code, § 355 [limiting instruction is given "upon request"] ) or a character instruction (*People v. Bell* (1875) 49 Cal. 485, 489-499 [instruction, if supported, should be given upon request] ). Accordingly, Sanders claims ineffective assistance of trial counsel for not objecting on those grounds and seeking limiting instruction.

**The law.** To establish his ineffective assistance claim, Sanders "'"bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness . . . under prevailing

professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 170.)

Because Sanders's principal complaint concerns trial counsel's failure to object to evidence, we must observe: "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citations.]" (*People v. Salcido, supra,* 44 Cal.4th at p. 172.)

The underlying legal principles for other crimes evidence are also well settled. "Evidence Code section 1101, subdivision (a) generally prohibits the admission of a criminal act against a criminal defendant 'when offered to prove his or her conduct on a specified occasion.' Subdivision (b), however, provides that such evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . .).' To be admissible, such evidence "'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." [Citation.] [Citation.] Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. [Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 229, quoting in part from *People v. Ewoldt* 7 Cal.4th 380.) Sanders's plea of not guilty placed all elements of the charges at issue, including his intent. (*People v. Lindberg* (2008) 45 Cal.4th 1, 23 (*Lindberg*); *People v. Balcom* (1994) 7 Cal.4th 414, 422-423.)

It is ""'long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution ." [Citation.] (*People v. Roldan* (2005) 35 Cal.4th 646, 706 (*Roldan*).) While other-crimes evidence must show *distinctive common marks* to be admissible on the issue of identity, "[a] somewhat lesser degree of similarity is required to show a common plan or scheme and still less similarity is required to show intent. [Citation.]" (*Id.* at p. 705.) To prove intent, "the uncharged

13

misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance. [Citations.]" (*Lindberg, supra,* 45 Cal.4th at p. 23.)

"[M]otive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable. 'Motive is not a matter whose existence the People must prove or whose nonexistence the defense must establish. [Citation.] Nonetheless, "[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence.'" [Citation.] (*Roldan, supra,* 35 Cal.4th at p. 707.) "[T]he probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus. [Citations.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.)

**Analysis**. Defense counsel was not asked on the record why he did not object or seek instruction on the bases now urged. The record, however, suggests a satisfactory explanation and therefore does not show deficient performance. (*People v. Salcido, supra,* 44 Cal.4th at p. 170.)

Defense counsel did object when he thought he might keep the evidence out as hearsay or lacking a foundation of personal knowledge, but once he realized that Taylor and Lopez would have adequate personal knowledge of the matter, he could reasonably have felt, as a tactical matter, that trying to exclude his client's pimp status based on other crimes principles would likely fail and that to seek a limiting instruction along those lines would only stress for the jury the permissible uses of his pimp status to show intent and motive.

On the issue of intent, Sanders stresses that he "was not charged with pimping or pandering" and that Lopez and Taylor were not even his 'girls,' but he ignores that he was charged in part with conspiring with Saelio and/or the others to rob and burglarize Allen. Not only did Sanders's plea of not guilty place all elements at issue (*People v. Balcom, supra,* 7 Cal.4th at pp. 422-423), but his counsel had argued from the start, on a set-aside motion, that there was no evidence of conspiracy. Counsel also revealed in opening statement that the defense would be that Saelio shot the victim, that Sanders was neither present nor a conspirator, and that Lopez and Taylor, as victims of intimate partner battering syndrome, were lying to cover for Saelio. Jurors would also be instructed, in the language of CALCRIM No. 415: "The People must prove that the members of the alleged conspiracy had an agreement and intent to commit Robbery and/or Burglary. . . . *An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.* (Italics added.)

In these circumstances, evidence that Sanders and Saelio were friends who had worked and traveled together shortly before the charged crime, as business associates plying their respective pimping trades, was substantially probative that they were again acting with a common purpose at the time of the charged offense, which again involved travel together. The prosecution also needed this evidence

14

to counter anticipated expert defense testimony that pimps act alone.  Defense counsel could rationally conclude that the uncharged pimping was "sufficiently similar to the charged offenses[s] to support the inference that [Sanders] probably acted with the same intent in each instance.  [Citations.]"  (*Lindberg, supra,* 45 Cal.4th at p. 23.)

Defense counsel could also rationally anticipate that the evidence's probative value would not be deemed substantially outweighed by risk of undue prejudice (Evid.Code, § 352).  Revealing Sanders's pimp status would not involve any lurid or violent details to render it comparable to the inflammatory charged crimes, and there would be no risk of confusing the issues, given that Sanders was not charged with pimping or pandering, and there was no dispute that the accomplice/witnesses Lopez and Taylor were prostitutes working for Saelio, not Sanders.  (*Lindberg, supra,* 45 Cal.4th at p. 25.)  Counsel also would have known that Sanders, in a phone call from jail, said, "I'm gonna need you to call my ho's for me," and that the prosecutor would use this evidence in any event.[FN2]

FN2. The prosecutor did argue, in closing:  "It's funny, Mr. Pendergast made a big deal out of the fact that we're saying that the defendant's a pimp, and there are a number of reasons that we need to sort of just show that.  And I don't really think there's a question about this based on what he said himself in his jail phone calls.  He told this female he's going to stop being a pimp.  He wants her to collect from his hoes, in order to use the money for bail.  And I'll get to why that's important in a second, but that's pretty much established.  I mean, Kim Saelio has been a pimp for a couple of months.  He's been a pimp for years."  Sanders does not argue that the admission of his own telephone conversation should have been excluded as other-crimes evidence.

Intent aside, the prospects for exclusion would have seemed even dimmer to counsel given the evidence's probative value on *motive,* which did not necessarily require any similarity at all.  The defense strategy was to deny that Sanders went along on the trip to Vallejo, or knew anything about the conspiracy or resulting murder, and that he rented the motel room innocently and openly (in his own name) upon the conspirators' return to Oakland.  Evidence of his prior business relationship and travel with Saelio was crucial to explaining why he would get involved in the conspiracy, when it apparently involved a business problem directly affecting only Saelio and Saelio's prostitutes.  This was highly probative of motive, and the charged and uncharged crimes had a direct logical nexus. (*People v. Demetrulias, supra,* 39 Cal.4th at p. 15.) [FN3]  For the reasons already discussed for motive (*ante*), it would not appear to counsel that this evidence was substantially outweighed by risk of undue prejudice. (Evid.Code, § 352.)

FN3.  The jury was instructed (CALCRIM No. 370):  "The People are not required to prove that the defendant had a motive to commit any of the crimes charged.  In reaching your verdict, you may, however, consider whether the defendant had a motive.  Having a motive may be a factor tending to show that the

defendant is guilty.  Not having a motive may be a factor tending to show the defendant is not guilty."

Accordingly, deficient performance is not shown in trial counsel's failure to seek exclusion based on undue prejudice and other-crimes principles. (Evid.Code, §§ 352, 1101, subd. (b).)

We reach the same conclusion on the arguably separate issue of counsel's failure to request instructions on character and limited use of other crime to show intent and motive, as opposed to bad character or propensity (CALCRIM Nos. 350 & 375).  The record does not rule out a conceivable tactical basis for the inaction. (*People v. Salcido, supra,* 44 Cal.4th at p. 172.)  Our perusal of the prosecutor's jury argument shows no attempt to use Sanders's pimp status to show bad character or propensity, only motive and intent.[FN4]  Satisfied in the end that no improper use had been urged, defense counsel could have felt that an instruction stressing at length all permitted uses (CALCRIM No. 375) was tactically ill-advised.  Counsel could similarly have felt, earlier, that having such an instruction given before jury arguments, would have opened the door to stronger use by the prosecutor, with the imprimatur of court approval.

FN4.  The prosecutor initially argued to the jury, for example:  "Now, think about this for a second.  He's from Oakland, right?  There's no reason for him to be here except to help his good friend, Kim Saelio, commit these crimes."  He then added after defense argument:  "And it's funny, too, it makes sense, if you think about it, that the defendant would accompany Mr. Saelio up to Vallejo. . . .  It makes sense that the defendant would go with his good buddy, Kim Saelio, to help, doesn't it?"  That was argument urging use to show motive, not bad character or propensity.

Because deficient performance is not shown, there is no need to address prejudice, and nothing suggests federal due process error.  The record shows only proper and brief utilization of the pimping evidence to argue intent and motive as permitted by statute (Evid.Code, § 1101, subd. (b); see fn. 4, *ante* ).  Application of 'the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights,' and Sanders "fails to persuade us his case presents an exception to this general rule." (*Lindberg, supra,* 45 Cal.4th at p. 26.)[32]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Sanders must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[33]  A deficient performance is one in which counsel made errors so serious that

---

[32] *Sanders*, 2008 WL 2427737 at *5-*9 (alterations in the original).

[33] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[34]  Sanders must show that his defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[35]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[36]

While judicial inquiry into counsel's performance under *Strickland* must be highly deferential, it is "by no means insurmountable," but nonetheless remains "highly demanding."[37] "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial."[38]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general

---

[34] *Id*.

[35] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[36] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *United States v. Cronic*, 466 U.S. 648, 258 (1984) ("the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.").

[37] *Morrison*, 477 U.S. at 382.

[38] *Id.*

standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[39]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[40]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard.  Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,][which] is different from an *incorrect* application of federal law."[41]

Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[42]

Sanders bears the burden of proving that counsel's trial strategy was deficient.  "[Sanders] must overcome the presumption that, under the circumstances, the challenged action 'might be

---

[39] *Knowles v. Mirzayance*, 556 U.S. ___, ___, 129 S. Ct. 1411, 1420 (2009).

[40] *See id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[41] *Harrington v. Richter*, 562 U.S. ___, ___, 131 S. Ct. 770, 785 (2011) (emphasis in the original).

[42] *Id.* 562 U.S. at ___, 131 S. Ct. at 786.

18

considered sound trial strategy.'"[43]  "[Sanders] bears the heavy burden of proving that counsel's

assistance was neither reasonable nor the result of sound trial strategy."[44]  "In determining

whether the defendant received effective assistance of counsel, 'we will neither second-guess

counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer

to counsel's sound trial strategy."[45]  "Because advocacy is an art and not a science, and because

the adversary system requires deference to counsel's informed decisions, strategic choices must

be respected in these circumstances if they are based on professional judgment."[46]

"A convicted defendant making a claim of ineffective assistance must identify the acts or

omissions of counsel that are alleged not to have been the result of reasonable professional

judgment."[47]  The court must then consider those acts or omissions against "prevailing

professional norms."[48]  Even then, "counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment."[49]

Other than to argue in conclusory terms that there could have been no conceivable tactical

reason for counsel not to have objected on the "bad acts" ground, Sanders presents no argument

or facts in support of that conclusion.  Sanders has not met the heavy burden be must bear to

---

[43] *Strickland*, 466 U.S. at 689.

[44] *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001).

[45] *Id.* (quoting *Strickland*, 466 U.S. at 689).

[46] *Strickland*, 466 U.S. at 681.

[47] *Id*. at 690.

[48] *Id*.

[49] *Id*.

establish an ineffective assistance of counsel claim.  He has shown no evidence indicating that

counsel was unreasonable or ineffective for selecting his chosen trial strategy.  He presented no

alternate attorney's determination challenging counsel's decision to pursue an intoxication

defense.  He has not quoted any "[p]revailing norms of practice as reflected in American Bar

Association standards and the like" indicating that counsel acted outside these norms.[50]

      This Court cannot say that the decision of the California Court of Appeal was "contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States" or "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."[51]  Nor, viewing the matter

through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court

unreasonably applied the correct legal principle to the facts of the Petitioner's case within the

scope of *Andrade-Williams-Schriro*; *i.e.*, the state court decision was more than incorrect or

erroneous, its application of clearly established law was objectively unreasonable.  Sanders has

failed to establish that counsel committed any error that was so serious that counsel was not

functioning as the counsel guaranteed by the Sixth Amendment or that his defense was

prejudiced, as required by *Strickland-Hill*.  In particular, Sanders has failed to overcome the

strong presumption that his trial counsel's conduct falls within the wide range of reasonable

professional assistance.  Sanders is not entitled to relief under his second ground.

---

[50] *Id.* at 688.

[51] 28 U.S.C. § 2254(d).

Ground 3:  Jury Misconduct

Sanders moved for a new trial, claiming that by discussing his failure to present an alibi

defense the jury infringed upon his right to remain silent and shifted the burden of proof to the

defense.  The trial court denied Sanders's motion.  On direct appeal, the California Court of

Appeal rejected Sanders's arguments, holding:

> ### New Trial Motion Based on Jury Misconduct
>
> Sanders moved for a new trial, claiming jury misconduct (Pen.Code, §
> 1181, subd. 3) by discussing his failure to present an alibi defense.  The court
> considered and denied the motion, at sentencing, without an evidentiary hearing.
> Sanders claims that the ruling denied him federal due process and a fair trial by
> infringing his right to remain silent and shifting the burden of proof to the
> defense.  No error appears.
>
> The claim was based on these paragraphs of a declaration by the jury
> foreperson:  "6. *The jury discussed and considered* a number of factors, including
> but not limited to:  testimony of Carla Lopez; testimony of Amanda Taylor; cell
> phone records; recorded jail phone calls; the collection and lack of collection of
> physical evidence; *the Defendant's failure to present an alibi defense*; testimony
> of the investigating officers; and testimony of the defense experts. [¶] 7.  It was
> only *upon a full consideration and discussion with the other jurors of each and
> every one of the above listed factors,* and others not heretofore mentioned, that *I
> cast my votes* for guilty and determined the enhancements to be true.  *Each of said
> factors played an important and material role in my decision, discussion and
> deliberation of this matter.*  (Italics added.)
>
> Applying a so-called *Duran* analysis of (1) admissibility of the declaration,
> (2) whether admissible facts showed misconduct, and (3) whether any misconduct
> was prejudicial (*People v. Duran* (1996) 50 Cal.App.4th 103, 112-113; see more
> fully *People v. Danks* (2004) 32 Cal.4th 269, 301-304), the court ruled:  "[T]he
> declaration or affidavit is admissible, so I will consider it.
>
> "So the first question is whether or not the conduct that they state through
> this affidavit that they engaged in while determining the guilt or innocence of this
> defendant was misconduct or not.  Frankly, I'm not convinced that it is
> misconduct, although it may be.  It's kind of a close call.  But I will, for purposes
> of this hearing, I'll make a finding that it may be misconduct.
>
> "So I'll go to the third step, whether or not that conduct or misconduct was
> prejudicial.  As to [defense counsel's] allegation that he feels that based on the
> declaration that, [what] they've done is basically shifted the burden of proof from
> the D.A. over to the defense, I don't think that is true.  I don't agree with that.
> And in my opinion, there's nothing in there that indicated that they discussed
> whether or not the defendant testified or not, whether or not they're punishing

him, as it were, for not testifying.  They don't mention that, and they comment on
. . . basically what is kind of foreseeable evidence that in any criminal case, many
criminal cases, certainly this one here, that an alibi-was there some kind of alibi
presented?  Well, that is in no way the same as saying,  'Well, the defendant
didn't testify.  Why didn't he testify where he was?'  They don't say that.  They
simply say there wasn't an alibi defense, and they were kind of concerned with
that, and that was one of at least eight factors that they considered.

  "So I don't think, even if there was misconduct, clearly, in my view, it was
not prejudicial to the defendant.  It did not affect his right to get a fair trial, and
there is no substantial likelihood that the defendant suffered actual harm based on
the conduct of the jury.  So I'm going to deny the motion for new trial."

  We begin with the first step in the *Duran* process-admissibility.  The trial
court simply found the declaration to be "admissible," but this was only partly
true.  Evidence of internal thought processes of jurors is generally inadmissible to
impeach the verdict.  (Evid.Code, § 1051, subd. (a).)  "The [verdict] may be
challenged by evidence of *'statements* made, or conduct, conditions, or *events*
occurring, either within or without the jury room, of such a character as is *likely* to
have influenced the verdict improperly,' but '[n]o evidence is admissible to show
the [*actual* ] *effect* of such statement, conduct, condition, or event upon a juror . . .
or concerning the mental *processes* by which [the verdict] was determined.'
[Citations.]  Thus, where a verdict is attacked for juror taint, the focus is on
whether there is any *overt* event or circumstance, 'open to [corroboration by]
sight, hearing, and the other senses' [citation] which suggests a *likelihood* that one
or more members of the jury were influenced [improperly]."  (*In re Hamilton*
(1999) 20 Cal.4th 273, 294, fn. omitted.)

  By those criteria, very little of each paragraph was admissible.  Paragraph
6 related that *The jury discussed and considered* a number of factors, including
. . . *the Defendant's failure to present an alibi defense* . . . .  (Italics added.)  To
say that the jury "considered" those factors, of course, is a barred recital of
internal thought processes.  Thus none of what was "considered" was admissible,
and Sanders does not expressly argue otherwise.

  What he stresses, and what the court presumably focused on, was the
recitation that the jury "discussed" those factors during its deliberations.  This is a
closer question.  The Attorney General argues: "The discussions referred to in the
declaration could have been heard by a third party.  However, that does not
change the fact that the discussions were verbalizations of the effect the evidence
had on the jurors and of the mental processes by which they reached their
verdicts."  We disagree.  True, what the jury "discussed" was revealed here in the
context of relating what jurors "considered," but to call this a "verbalizations of
the effect" on their verdict simply begs the question.  If a discussion is an *overt*
event or circumstance, 'open to [corroboration by] sight, hearing, and the other
senses' (*In re Hamilton, supra,* 20 Cal.4th at p. 294), as has been held (*People v.
Perez* (1992) 4 Cal.App.4th 893, 907), then that fact stands apart from the

inadmissible aspect that the *subject* of that discussion was *considered* while deliberating.

Similarly, paragraph 7 is inadmissible to the extent that the foreperson says, "[A] full consideration and discussion with the other jurors of each and every one of the above listed factors . . . *played an important and material role in my decision, discussion and deliberation of this matter.* (Italics added.)  That impermissibly reflects the foreperson's thought processes.  (See, e.g., italicized language in *People v. Danks, supra,* 32 Cal.4th at pp. 300-301.)  It *permissibly adds* that the event was a discussion she had "with the other jurors," although this was already implicit in paragraph 6.

The question, then, is whether the admissible parts established misconduct.  In order to reach the question of prejudice, the trial court was ambivalent:  "Frankly, I am not convinced that it is misconduct, although it may be[, but,] for purposes of this hearing, I'll make a finding that it may be mis-conduct."  In our view, no misconduct was shown, and this obviated the need to consider prejudice at all.

Jurors were given a standard instruction that a defendant has a constitutional right not to testify and that the fact that he does not testify cannot be discussed or considered.  (CALCRIM No. 355.)  '[B]y violating the trial court's instruction not to discuss defendant's failure to testify, the jury commit[s] misconduct" (*People v. Avila* (2009) 46 Cal.4th 680, 726), but Sanders did not show a discussion of his failure to testify.  The declaration reveals no statements at all, only that the jury "discussed . . . the Defendant's failure to present an alibi defense[.]"  As the trial court observed, an alibi defense need not be presented through a defendant's testimony.  The jury was instructed to consider "only the evidence that was presented in this courtroom" (CALCRIM No. 222), and the declaration shows that the jury recognized-properly-that no "alibi defense" was presented.  Sanders asks us to suppose that jurors thought it was "the normal practice" for a defendant to personally present an alibi, perhaps with other witnesses to "corroborate" it, but this is speculation.  We begin with a presumption that a jury understands and faithfully follows instructions (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17), and the showing here left that presumption unrebutted (cf. *People v. Adcox* (1988) 47 Cal.3d 207, 253).  Indeed, artfully vague wording of the declaration gave no actual utterances by any juror, only that a lack of alibi defense—a permitted consideration of the trial evidence—was "discussed."

A useful analogy is to prosecutor misconduct in the form of *Griffin* error, i.e., comment on a defendant's failure to testify (*Griffin v. California* 380 U.S. 609), where the concern is the same—penalizing a defendant's exercise of the right not to testify or incriminate himself.  (*People v. Ghent* (1987) 43 Cal.3d 739, 771.)  Cases in that context uniformly stress that *Griffin* does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses.  (*People v. Hughes* (2001) 27 Cal.4th 287, 372; *People v. Miller* (1990) 50 Cal.3d 954, 996; *People v. Hovey* (1988) 44

Cal.3d 543, 572; *People v. Ratliff* (1986) 41 Cal.3d 675.)  In a case overlooked by the parties, our high court found no *Griffin* error in comment on failure to present an alibi.  (*People v. Brown* (2003) 31 Cal.4th 518, 552 ["'If he wasn't there, where was he?  Everyone else says he was there.  Where was he?  No alibi witness took the stand and said he was with me that night watching TV.  You didn't hear any of that, did you?'"].)  The court held:  "By directing the jury's attention to the fact defendant never presented evidence that he was somewhere else when the crime was committed, the prosecutor did no more than emphasize defendant's failure to present material evidence.  He did not capitalize on the fact defendant failed to testify.  Accordingly, there was no *Griffin* error." (*Id.* at p. 554.)

The declaration here, that the jury discussed, as one of eight specified "factors" concerning the state of the evidence, Sanders's failure to present an alibi defense, was no more objectionable.  It failed to show jury misconduct.[52]

The error complained of is based upon matters that occurred during jury deliberations.

There is no allegation that the jury, or any juror, was influenced by an external factor.  Nor, is there any allegation or evidence that the jury's discussion of the lack of an alibi defense was the result of any prosecutorial misconduct.  The decision of the California Court of Appeal not only was not contrary to established federal law as determined by the Supreme Court, it was consistent with it.  Under Federal law, the inquiry into the validity of a verdict is severely circumscribed.

Inquiry into validity of verdict or indictment.—Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.  But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form.  A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.[53]

---

[52] *Sanders*, 2008 WL 2427737 at *9-*13 (emphasis and alterations in the original).

[53] Fed. R. Evid. 606(b).

"Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences."[54]  As the Supreme Court has noted:

> By the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict.  See 8 J. Wigmore, Evidence § 2352, pp. 696-697 (J. McNaughton rev. ed. 1961) (common-law rule, originating from 1785 opinion of Lord Mansfield, "came to receive in the United States an adherence almost unquestioned").
>
> Exceptions to the common-law rule were recognized only in situations in which an "extraneous influence," *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), was alleged to have affected the jury.  In *Mattox,* this Court held admissible the testimony of jurors describing how they heard and read prejudicial information not admitted into evidence.  The Court allowed juror testimony on influence by outsiders in *Parker v. Gladden,* 385 U.S. 363, 365, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966) (bailiff's comments on defendant), and *Remmer v. United States,* 347 U.S. 227, 228-230, 74 S.Ct. 450, 450-452, 98 L.Ed. 654 (1954) (bribe offered to juror).  See also *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (juror in criminal trial had submitted an application for employment at the District Attorney's office).  In situations that did not fall into this exception for external influence, however, the Court adhered to the common-law rule against admitting juror testimony to impeach a verdict. *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *Hyde v. United States,* 225 U.S. 347, 384, 32 S.Ct. 793, 808, 56 L.Ed. 1114 (1912).[55]

In this case, Sanders does not allege any external influence.  The Supreme Court has never held that the consideration during deliberations by a jury, or any individual juror, of the fact that the defendant did not present a defense violated a criminal defendant's rights to a jury trial under the Sixth Amendment.  Indeed, because the Federal Rules of Evidence, which are

---

[54] *Tanner v. United States*, 483 U.S. 107, 121 (1987).

[55] *Id.* at 117.

adopted by the Supreme Court,[56] preclude consideration of a juror's mental processes, any assumption that the Supreme Court did is counter-intuitive.  Any rights that Sanders had on this issue arose under California state law,[57] which differs substantially from federal law.  That is, although it is permissible to challenge a jury verdict on the basis of internal factors under California law, it is impermissible under federal law.  Thus, this Court may not consider the affidavit of the juror in this proceeding.[58]  As a right created by state law, whether the state courts properly interpreted or applied that law is beyond the purview of this Court in a federal habeas proceeding.[59]  "[The Supreme Court has] long recognized that a mere error of state law is not a denial of due process."[60]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[61]  Sanders has failed to present a question of constitutional dimension, and is, therefore, not entitled to relief under his third ground.

---

[56] 28 U.S.C. § 2072(a).

[57] Cal. Evid. Code § 1051(a).

[58] *Harrison v. Gillespie*, 640 F.3d 888, 895 n.4 (9th Cir. 2011) (en banc) (declining to consider juror testimony in a federal habeas case because it did not bear on extraneous influences on jury deliberations).

[59] *Swarthout v. Cooke*, 562 U.S. ___, ___, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).

[60] *Id.* (internal quotation marks and citations omitted).

[61] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted); *see Wainwright v. Goode*, 464 U.S. 78, 86 (1983) (per curiam).

## V.  CONCLUSION AND ORDER

Sanders is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[62]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[63]

The Clerk of Court is to enter judgment accordingly.

Dated:  August 5, 2011.

          /s/ James K. Singleton, Jr.

          JAMES K. SINGLETON, JR.

          United States District Judge

---

[62] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705-06 (2004) ("to obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's  resolution of his constitutional claims or that jurists could conclude  the issues presented are adequate to deserve encouragement to proceed further.'") (quoting *Miller-El*, 537 U.S. at 327)).

[63] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.